# WELLS FARGO BUSINESS CREDIT *vs.* ENVIRONAMICS CORPORATION & others.[1]

No. 09-P-960.

Suffolk. February 4, 2010. - September 27, 2010.

Present: BERRY, COHEN, & KATZMANN, JJ.

*Practice, Civil,* Summary judgment. *Guaranty. Contract,* Modification. *Evidence,* Parol evidence. *Loan. Waiver. Uniform Commercial Code,* Secured creditor, Sale of collateral.

In a civil action brought in Superior Court by the plaintiff creditor to, inter alia, collect on personal guaranties given by two defendants (guarantors), the judge, in granting summary judgment in favor of the plaintiff, correctly concluded that, given that the guaranties required that any modifications be in writing, the parol evidence relied on by the guarantors failed to present ambiguity that would create a genuine issue of material fact concerning forbearance on the foreclosure date. [816-819]

In a civil action brought in Superior Court by the plaintiff creditor to, inter alia, collect on personal guaranties given by two defendant principal shareholders and officers (guarantors) of the defendant corporation (corporation) as further surety on a loan to the corporation, which was secured by the corporation's assets, the judge, in granting summary judgment in favor of the plaintiff, erred in concluding that the plaintiff's disposition of the collateral was commercially reasonable, where the single affidavit submitted by the plaintiff, viewed in light of the guarantors' proffer, i.e., evidence that in totality placed the issue of commercial reasonableness squarely into contention, failed to prove the absence of a genuine issue of material fact [819-822]; however, no genuine issue of material fact existed as to whether the plaintiff provided reasonable notice of the disposition of the collateral [823-824]; or as to the amount of damages [824-825]; or that all the guarantors' counterclaims were waived under the terms of the guaranties [825].

CIVIL ACTION commenced in the Superior Court Department on May 2, 2007.

The case was heard by *Linda E. Giles,* J., on a motion for summary judgment, and entry of separate and final judgment was ordered by *Isaac Borenstein,* J.

*Isaac Borenstein* for Robert Rockwood & another.

[1]Robert Rockwood and Roxana Marchosky.

*Lawrence G. Green* (*Michael K. Sugrue* with him) for the plaintiff.

KATZMANN, J. We consider an appeal of the allowance by a Superior Court judge of summary judgment issued in favor of plaintiff Wells Fargo Business Credit (WFBC) as to counts VI and VII of its complaint against defendants Robert Rockwood and Roxana Marchosky (guarantors), who were determined to be liable pursuant to personal guaranties made to WFBC under a credit and security agreement, and as to the guarantors' counterclaims against WFBC. The guarantors' appeal seeks review of (1) their liability, generally, as they claim an oral forbearance agreement precluded collection on this debt until the forbearance date had passed, (2) the commercial reasonableness of WFBC's disposition of the collateral under Article 9 of the Massachusetts Uniform Commercial Code (UCC), G. L. c. 106,[2] (3) whether WFBC complied with reasonable notice requirements prior to foreclosure, (4) the amount of the damages, and (5) the dismissal of their counterclaims. So much of the judgment as implicitly determined that the sale of the collateral was commercially reasonable is reversed and that issue is remanded for further proceedings consistent with this opinion, and in all other respects the judgment is affirmed.[3]

*Background.* The summary judgment record, which includes an informative memorandum from the motion judge, shows the following. Environamics Corporation (Environamics) was a New Hampshire corporation that manufactured pump and rotary equipment used in the processing industry. Environamics borrowed $3 million dollars from WFBC on May 7, 2004, and executed a credit and security agreement, a revolving note, and various documents granting WFBC a number of security interests in Environamics and its assets as collateral (collectively, loan documents).[4] The security interests included essentially, the

---

[2]A revised version of Article 9 of the UCC was adopted by the Legislature, St. 2001, c. 26, § 39, effective July 1, 2002, and replaces an earlier version of that statute. We cite to the revised version of Article 9, which governs the events in this case.

[3]Subsequent to the grant of summary judgment, WFBC moved for, and was granted, a final and separate judgment pursuant to Mass.R.Civ.P. 54(b), 365 Mass. 821 (1974).

[4]In order to obtain the loan, a number of asset valuations were performed

entirety of the operating assets of Environamics as well as its patents, copyrights, and inventory. As further surety on this loan, personal guaranties (guaranties) were offered on May 7, 2004, by the two principal shareholders and officers, Rockwood and Marchosky.

In July of 2005, Environamics failed to make payments of the loan. In lieu of assessing the default rate and permitting additional events of default from occurring, WFBC agreed, in a number of written agreements, to defer payments on the loan. These agreements spanned from July, 2005, through February, 2006, and imposed a fee for the accommodation and forbearance. According to the agreements, these extensions were permitted to facilitate the guarantors' attempts to capitalize Environamics with outside investment or find suitable buyers for the assets or company itself. Over this period, the guarantors sought a number of potential buyers, but were unable to finalize a deal.

In late February of 2007, WFBC hired Gordon Brothers Group to put together a book on Environamics to assist in the sale and marketing of the company as an entity. Gordon Brothers Group created a teaser mailing and distributed it to approximately 130 companies targeted for potential interest. Six companies responded and requested additional information, which was anticipated to be contained in the book. Receipt of the book was predicated upon the execution of nondisclosure agreements. This book presented a bid date in late June of 2007. According to the affidavit of WFBC's vice president, Vincent R. D'Alessandro, submitted in support of summary judgment, failure of the guarantors to provide requested information in order to complete the book prompted WFBC's filing of the lawsuit at issue in this appeal. The electronic mail message (email) entered as evidence at the summary judgment hearing contains objections that Rockwood voiced at the

---

to establish a value of the collateral. These valuations reflected very favorably on Environamics and established a value well exceeding the amount of the loan. Murray and Devine Company completed a patent valuation as of April 23, 2004, establishing the value for Environamics's patents at $18 million. Koster Associates completed an inventory appraisal as of April 12, 2004, establishing an orderly liquidation value for Environamics inventory at $2,068,864. DSI Investment Banking Services, Inc., completed an intellectual property valuation as of May 5, 2005, establishing a value for Environamics's intellectual property at $151.4 million.

time of the creation of the book. But other emails produced by Rockwood appear to show he was cooperative in response to questions posed by Gordon Brothers Group after a draft of the book was created. A version of the book as of April 9, 2007, was entered as evidence at the summary judgment hearing.

Prior to the lawsuit and during the difficulties regarding the book, through counsel, WFBC sent the defendants a demand letter demanding possession of the business premises. On May 2, 2007, in order to collect on the guarantees, WFBC filed the lawsuit. After a Superior Court judge ruled in WFBC's favor on its motion for a preliminary injunction, granting the right to all of Environamics' collateral subject to WFBC's security interests, WFBC proceeded with plans to either sell Environamics or liquidate its assets. In June of 2007, Environamics filed for bankruptcy in the United States District Court for the District of New Hampshire.[5] In or about September of 2007, the bankruptcy court awarded WFBC control of Environamics. An order converting Environamics's bankruptcy case from Chapter 11 to Chapter 7 of the United States Bankruptcy Code was entered on October 31, 2007.

WFBC proceeded to field offers for the assets individually, without Gordon Brothers Group's involvement. According to the affidavit submitted by WFBC's vice president, WFBC took various steps in contacting the six entities that had expressed interest prior to the lawsuit, as well as another company that had heard about the sale from the bankruptcy court. By offering to sell the patents and inventory separately, WFBC was able to negotiate and secure an offer of $479,000 from Dickow Pump Company, which sought to purchase the two assets together. On January 9, 2008, the guarantors were notified by WFBC's counsel of the pending sale through a letter sent via Federal Express and via email. This letter stated that the sale would take place on January 21, 2008. The terms of the loan documents contain the validity of telefacsimile service, but are silent as to email communication. Also, provisions of the loan documents state that notice, if given ten calendar days before the intended date of disposition, will be deemed commercially reasonable.

---

[5]As a result of Environamics filing for bankruptcy, the five counts listed in WFBC's complaint as against Environamics were stayed in Superior Court.

The guarantors, in a last moment attempt to prevent the sale, corresponded with WFBC's vice president concerning their ability to redeem the loan. They reiterated that they had $1.3 million available. This figure of $1.3 million had been discussed by the parties in regards to a previous correspondence, where such a figure would allay the sale of Environamics's assets. However, this figure would not redeem the loan amount, which had grown to over $3.95 million in October of 2007, and exceeded $4 million in January, 2008. WFBC disregarded these declarations because the guarantors could not provide documentation of the immediate availability of the funds. The sale of the assets ultimately did occur on January 21, 2008.

*Standard of review.* "The standard of review of a grant of summary judgment is whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law." *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991). Here, WFBC was the moving party.

I. *Liability of the defendants.* The guarantors argue there exists a genuine issue of material fact as to whether they are in breach of the loan documents. They contend that a genuine issue of material fact exists because WFBC had orally agreed to forbear enforcement of the guaranties at the time when the lawsuit was filed on May 2, 2007. The guarantors argue that the parties entered into oral agreements extending the forbearance to a period after the foreclosure date, or, in the alternative, that the Gordon Brothers Group's documents set a forbearance date subsequent to the foreclosure, on which the guarantors relied. We disagree.

"When the words of the guaranty 'are clear they alone determine the meaning.' " *Federal Financial Co.* v. *Savage*, 431 Mass. 814, 817 (2000) (citation omitted). See *Davis* v. *Wells*, 254 Mass. 118, 125 (1925) (a "guaranty is to be construed strictly"). The "liability of the guarantor . . . can be terminated only in accordance with the terms of the contract." *Federal Financial Co.* v. *Savage, supra,* quoting from *Merchants Natl. Bank* v. *Stone*, 296 Mass. 243, 252 (1936).

Here, each guaranty required any modifications be in writing.[6]

_____

[6]Paragraph numbered thirteen of the guaranty executed by Rockwood provides in part: "This Guaranty may not be waived, modified, amended,

In recognition of these provisions, the parties after default executed a number of written loan deferral agreements to modify the terms of the guaranties as to deferring payments. These agreements and all the promises thereunder expired March 3, 2006, more than a year prior to the date of this action.

As to the oral modification of a contract, "a provision that an agreement may not be amended orally but only by a written instrument does not necessarily bar oral modification of the contract." *Cambridgeport Sav. Bank* v. *Boersner*, 413 Mass. 432, 439 (1992). But in order to support the existence of an oral modification, the parol evidence must be sufficiently weighted and of competent probity to present a material issue for trial; that is, the parol evidence must be of sufficient strength to present an ambiguity between the actual conduct of the parties and the contract. See *Eastern Holding Corp.* v. *Congress Financial Corp. (New England)*, 74 Mass. App. Ct. 737, 742 n.5 (2009) (ambiguity cannot be predicated solely on statements in affidavits). See also *Cambridgeport Sav. Bank* v. *Boersner, supra* at 439 n.10 ("The evidence of a subsequent oral modification must be of sufficient force to overcome the presumption that the integrated and complete agreement, which requires written consent to modification, expresses the intent of the parties").

The speculative assertions as to the issue of oral modification made by Rockwood in various affidavits do not provide the specificity necessary to establish a dispute of material fact. See *Community Natl. Bank* v. *Dawes*, 369 Mass. 550, 554 (1976). The assertions find no reflection in the clear terms of the various

terminated, released or otherwise changed except by a writing signed by the Guarantor and the Lender." Paragraph numbered thirteen of the guaranty executed by Marchosky contains identical language. The credit and security agreement also requires written modification to alter Environamics's liability, which triggers the guarantors' liability. Section 8.2 of article VII of the credit and security agreement provides: "No amendment, modification, termination or waiver of any provision of any Loan Document or consent to any departure by the Borrower therefrom or any release of a Security Interest shall be effective unless the same shall be in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given." Also notable is the fact that the guaranties contain additional prohibitions against the guarantors' liability being "affected or impaired" in the event of extensions, modifications, and accommodations of the borrower.

written loan deferral agreements duly executed by the parties and in some cases expressly contradict provisions of these agreements. We note that Rockwood also asserts that additional documents memorialized the 2007 forbearance agreements, but were stored at a facility seized by WFBC and were unavailable to him and Marchosky. Rockwood, however, provides no detail about those asserted forbearance agreements, no information as to who signed them, or the extent of their coverage. We reject the attempt to create an ambiguity by disregarding the affidavit as to the issue of liability. See *Martino* v. *Hogan*, 37 Mass. App. Ct. 710, 721 n.12 (1994) (disregarding self-serving affidavit on review of summary judgment); *Eastern Holding Corp.* v. *Congress Financial Corp. (New England)*, *supra* at 741-742 ("Because there is no contract language supporting [the defendant's] interpretation of the seventh loan, we discern no ambiguity that would permit the introduction of extrinsic evidence as to the parties' intentions in this regard"). See also *Billings* v. *GTFM, LLC*, 449 Mass. 281, 294-295 (2007).

Next, the guarantors assert that a voicemail left by WFBC's vice president constitutes evidence of the oral forbearance agreement that was in place. That voicemail is ostensibly from April 13, 2007, and on appeal the guarantors provided this court with a transcription of its contents. The portion emphasized by the guarantors states, "there's still many weeks as far as your other avenues." That statement was made in relation to the guarantors other avenues of disposition. It does not create a genuine issue of material fact because it does not refer to the existence of a forbearance agreement and would not, in any event, be sufficient to contravene the writing requirement of the loan documents. Indeed, the statement more likely refers to the right of the guarantors to redeem the loan.

Finally, the guarantors assert that the Gordon Brothers Group's sale date and other aspects of the marketing create a genuine issue of material fact as to forbearance under an oral "going concern" agreement.[7] However, the only evidence supporting the existence of a going concern agreement involving forbear-

---

[7]According to the guarantors, "[T]he Going Concern Agreement was a separate oral contract entered into in or around February, 2007. The parties agreed therein to jointly sell Environamics as a going concern, with Gordon Brothers acting as financial advisor. The proceeds from the sale were to be

ance is Rockwood's affidavit dated May 22, 2008.[8] The underlying security agreement and guaranties are clear in their terms and require more than conjecture for modification. See note 6, *supra*. Because the affidavit fails to comprise anything beyond Rockwood's own belief of the existence of an oral going concern agreement, we disregard it as a basis for ambiguity. See *Eastern Holding Corp.* v. *Congress Financial Corp. (New England)*, 74 Mass. App. Ct. at 742 n.5. See also *The General Convention of the New Jerusalem in the U.S., Inc.* v. *MacKenzie*, 449 Mass. 832, 836 (2007) ("extrinsic evidence cannot be used to contradict or change the written terms, but only to remove or to explain the existing uncertainty or ambiguity").

In sum, there is no genuine issue of material fact concerning forbearance on the foreclosure date. No forbearance agreement was in effect on the date of foreclosure and WFBC is entitled to summary judgment as to the guarantors' liability for the debts of Environamics.

II. *Commercial reasonableness.* The guarantors also claim that a material issue of fact was raised concerning whether WFBC's sale of the collateral was commercially reasonable as required by the UCC. We agree that the judge should have denied WFBC's motion for summary judgment as to that issue.

After default, a secured party, such as WFBC, is entitled to dispose of the collateral. See G. L. c. 106, § 9-610(*a*).[9] Sales of collateral not held within a "recognized market" (such as a stock market or other market fixing a value to a commodity) must conform "with reasonable commercial practices among dealers in the type of property that was the subject of the disposition." G. L. c. 106, § 9-627(*b*)(1) & (3). See Official Comment 2 to

split, with Wells Fargo receiving 75% and Rockwood and Marchosky receiving 25% after the payment of the first $1.2 million dollars to Wells Fargo. The Going Concern Agreement also included the release of Rockwood and Marchosky from the Guaranties. The parties further agreed that all legal actions and payments would be forborne by Wells Fargo until at least June 30, 2007, which was the due date for submission of offers by potential buyers."

[8]This affidavit describes aspects of Gordon Brothers Group's marketing of Environamics that included a proposed date of June 29, 2007, for all final bids.

[9]General Laws c. 106, § 9-610(*a*), states: "After default, a secured party may sell . . . or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing."

Uniform Commercial Code § 9-627, 3 U.L.A. 568 (Master ed. 2002). A debtor's right to a commercially reasonable disposition cannot be waived. *Shawmut Worcester County Bank, N.A.* v. *Miller,* 398 Mass. 273, 279 (1986). It has also been noted that "generally, where a creditor is proceeding against a debtor for a deficiency after disposing of collateral, courts place the burden of proving commercial reasonableness on the creditor." *Shawmut Bank, N.A.* v. *Chase,* 34 Mass. App. Ct. 266, 270 (1993), citing Federal cases. See G. L. c. 106, § 9-626(*a*)(2). Furthermore, Massachusetts case law does "underscore the lack of precision in the meaning of the term 'commercially reasonable'; its determination depends on the particular facts in each case." *Poti Holding Co.* v. *Piggott,* 15 Mass. App. Ct. 275, 277 (1983). Thus, to obtain summary judgment as to that issue, WFBC would have had to provide incontrovertible evidence that the sale was commercially reasonable as an essential element of their claim.

"Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." G. L. c. 106, § 9-610(*b*). See *Shawmut Worcester County Bank, N.A.* v. *Miller, supra* at 276. See generally 4 White & Summers, Uniform Commercial Code § 34-11, 464-466 (6th ed. 2010) (aside from price, several other factors are relevant to the determination of whether a transaction is commercially unreasonable: [1] whether the timing between the sale and notice was too short or too long; [2] whether the seller advertised the sale; [3] whether the sale was in a proper place; [4] whether the seller permitted necessary inspections by prospective bidders; [5] whether the seller performed necessary repairs; and [6] whether the seller held the sale at the same time and location as advertised). In this regard, adjudication of the " 'commercially reasonable' standard . . . produces inquiry into the competence and aggressiveness of the marketing effort." *Pemstein* v. *Stimpson,* 36 Mass. App. Ct. 283, 291 (1994). See *Nadler* v. *BayBank Merrimack Valley, N.A.,* 733 F.2d 182, 184 (1st Cir. 1984) (requiring debtor to "point to specific deficiencies in the conduct of the sale that render it commercially unreasonable").[10] See also Annot., *What is "Commercially Reasonable" Disposition of Collateral Required by UCC § 9-504(3),* 7

---

[10]As a facial matter, obtaining a lower price than what could have been

A.L.R.4th 308 § 14, 387-392 (1981 & Supp. 2010) (discussing cases where "familiarity of a secured party selling repossessed collateral, or of one selling such collateral for a secured party, with the type of property involved, or with the market for such property, has been recognized . . . as an important factor to be considered, along with other circumstances of the particular case, in determining whether . . . all aspects of a disposition of repossessed collateral be commercially reasonable").

Here, the evidence raises an issue as to whether WFBC pursued commercially reasonable avenues for marketing and selling Environamics's assets. WFBC supported its summary judgment motion with a single affidavit that was silent as to the background of its vice president, and affiant, who conducted the sale. The guarantors, however, presented documents created by experts that establish material factual issues regarding the methods of marketing prior to disposition. Specifically, the documents submitted by the guarantors highlighted the deficiencies in the evidence supporting WFBC's motion for summary judgment as to that issue. Those documents suggest that there were numerous other avenues consistent with industry practice that could have achieved the goal of liquidating the assets to achieve more reasonable value. Furthermore, the guarantors presented an affidavit from an Environamics employee describing how the assets could be sold separately for more money within the pump industry, as opposed to as mere scrap metal. Moreover, the guarantors supported their over-all argument against commercial reasonableness with evidence that described

obtained under other circumstances does not make the sale commercially unreasonable. G. L. c. 106, § 9-627(*a*). "The fact that a greater amount could have been obtained by a collection, enforcement, disposition, or acceptance at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the collection, enforcement, disposition, or acceptance was made in a commercially reasonable manner." *Ibid.* A comment to G. L. c. 106, § 9-610, cautions that "a low price suggests that a court should scrutinize carefully all aspects of a disposition to ensure that each aspect was commercially reasonable." Official Comment 10 to Uniform Commercial Code § 9-610, 3 U.L.A. 518 (Master ed. 2002). See 4 White & Summers, *supra* at § 34-11, 461, 464 (while not dispositive, price is the "eminence grise" in many transactions, and although price is a term of sale, a low price, in combination with noncomplying resale procedures under the UCC, is paradigmatic of a commercially unreasonable sale).

the pump market generally, established the value of the assets, and estimated costs associated with liquidation. See note 4, *supra.*

The totality of the evidence placed the issue of commercial reasonableness squarely into contention. See *Shawmut Worcester County Bank, N.A.* v. *Miller*, 398 Mass. at 282 ("Based on [guarantors'] affidavits, a genuine issue of material fact appears to exist" respecting the commercial reasonableness of secured party's sale of collateral). In short, there is a dispute as to whether WFBC's methods of sale were commercially reasonable "among dealers in the type of property that was the subject of the disposition." G. L. c. 106, § 9-627(*b*)(3). See G. L. c. 106, § 9-627. WFBC's affidavit, viewed in light of the guarantor's proffer, failed to meet its burden of proving the absence of a genuine issue of material fact on the commercial reasonableness of the disposition, and therefore summary judgment in favor of WFBC as to that issue was not properly granted and that issue needs to be resolved in further proceedings on remand.[11]

---

[11]If, on remand, it is determined by the fact finder that WFBC disposed of Environamics's collateral in a commercially unreasonable way, then the guarantors will be entitled to the rebuttable presumption that the fair market value of the collateral was $3 million. A finding of commercial unreasonableness resulting from specific deficiencies in the disposition gives the guarantor the benefit of the rebuttable presumption that "the fair value of the collateral and the amount of the debt were the same." *Shawmut Bank, N.A.* v. *Chase*, 34 Mass. App. Ct. at 271. See 1 Brown, The Law of Debtors and Creditors § 7:113, 7-169 (June, 2010) (under the rebuttable presumption doctrine, "the failure of the creditor to follow the restrictions of Pre-revision Part 5 of Article 9, such as the failure to conduct a commercially reasonable resale, creates a rebuttable presumption that the value that should have been received by the disposition of the collateral equaled the balance due on the outstanding debt").

Thus, if there is a finding of commercial unreasonableness, in order to prevail, WFBC will have to rebut the presumption by proving that a commercially reasonable sale would have obtained a lower amount than the loan amount. See 4 White & Summers, Uniform Commercial Code § 34-14, at 502. We note that WFBC was not under an obligation to retrieve the whole debt from the sale of the collateral, see G. L. c. 106, § 9-627(*a*), but a determination that the sale was not commercially reasonable may alter the damages to which WFBC is entitled. See G. L. c. 106, § 9-625(*c*)(1) ("a person that, at the time of the failure, was a debtor, was an obligor, or held a security interest in or other lien on the collateral may recover damages under subsection (b) for its loss"); G. L. c. 106, § 9-625(*b*) ("a person is liable for damages in the amount of any loss caused by a failure to comply with this article").

III. *Notice of intended disposition.* The guarantors also argue that the disposition was not commercially reasonable because WFBC failed to give reasonable notice of the disposition of the collateral.[12] They contend that the notice they were provided was not timely, they were not afforded a sufficient time prior to the disposition, and that a bank holiday on the date of disposition diminished duration of the notice and impaired their ability to redeem the collateral. Although raised by the guarantors, the motion judge did not address that issue. We do not need to resolve it either. Even assuming arguendo that there exists a genuine issue of fact as to the timeliness of the notice,[13] the

[12]A debtor may redeem his collateral before the secured party has disposed of it. G. L. c. 106 § 9-623(c)(2). To afford the possibility of redemption, "a secured party that disposes of collateral under Section 9-610 shall send to the [debtors] a reasonable authenticated notification of disposition" as a predicate to the actual disposition. G. L. c. 106, § 9-611(b). A so-called "safe harbor" provision, G. L. c. 106 § 9-612(b), provides: "a notification of disposition sent after default and 10 days or more before the earliest time of disposition set forth in the notification is sent within a reasonable time before the disposition." G. L. c. 106 § 9-612(b). "The 10-day notice period . . . is intended to be a 'safe harbor' and not a minimum requirement." Official Comment 3 to Uniform Commercial Code § 9-612, 3 U.L.A. 524 (Master ed. 2002).

[13]WFBC provided notice of the sale on January 9, 2008, via email and Federal Express. This notice further described the intended sale as taking place January 21, 2008. This date of notice places the notification within the safe-harbor provision, in terms of its delivery. The earliest date when receipt of the notice was established is Saturday, January 19, 2008, when the guarantors informed WFBC by email on that day that they have $1.3 million and wish to buy back all the assets of Environamics. This response email by the guarantors states that they attempted to contact WFBC's vice president at his office that day and would try the next day.

The safe harbor rule applies here, irrespective of the guarantors' objection as to the bank holiday. The guarantors were given twelve days from the moment of electronic notice to the morning of the sale date. The guarantors claim that this ten-day period should not include the bank holiday (January 21, 2008, Martin Luther King Day) because the redemption amount could not be wired on the bank holiday. Even assuming arguendo that they are correct in this regard, the record would appear to demonstrate that WFBC provided notification of at least ten days, which falls within the safe harbor. We note that the guarantors provide no authority that disposition on a bank holiday is precluded. Nothing in the guarantors' email describes wiring funds, or any other activities requiring the services of a financial institution. The responses of the guarantors to the notice are devoid of references to the bank holiday or requests for additional time. Even at the last moment, WFBC was willing to forestall the sale should the guarantors provide proof of the funds being available. The guarantors did not and WFBC proceeded. We find that notice was

guarantors fail to point to any evidence in the record that they could pay the redemption amount, regardless of its amount.[14] See G. L. c. 106, § 9-625(*b*) (damages calculated by the "amount of any loss caused by a failure to comply with this article"). For that reason, summary judgment as to the notice issue was properly granted.

IV. *Damages.* The guarantors, through assertions of Rockwood in his affidavits, claim that the motion judge neglected to consider the money in accounts seized by WFBC in September of 2007, in its award of damages. However, the record does not support the existence of any accounts, let alone the amounts, that were seized by WFBC. All citations in the guarantors' brief are to the affidavits of Rockwood or to documents immaterial to the issue. Without additional reference to some source beyond personal opinion, we can only consider these averments as being predicated upon information and belief. Such proof fails at summary judgment. See *Shapiro Equip. Corp.* v. *Morris & Son Constr. Corp.*, 369 Mass. 968, 968 (1976) ("All affidavits or portions thereof made on information and belief, as opposed to personal knowledge, are to be disregarded in considering a motion for summary judgment"). We discern no issue of material

---

timely provided in the safe harbor period, and that the guarantors were given reasonable notice of the sale and their right to redeem.

[14]The guarantors, in response to the notice of disposition, contend that $1.3 million was available to redeem the collateral and that their notice to WFBC of the availability of the funds should have prevented the sale. In order to redeem the collateral, the guarantors would have had to provide funds sufficient to "(1) fulfill[] . . . all obligations secured by the collateral; and [pay] (2) the reasonable expenses and attorney's fees described in Section 9-615(a)(1)." G. L. c. 106, § 9-623(*b*). For the invocation of the right of redemption, a party "must tender fulfillment of all obligations secured, plus certain expenses." Official Comment 2 to Uniform Commercial Code § 9-623, 3 U.L.A. 555 (Master ed. 2002). But more importantly, "[a] tender of fulfillment obviously means more than a new promise to perform an existing promise. It requires payment in full of all monetary obligations then due . . . ." *Ibid.*

The $1.3 million dollar figure was not the redemption amount, but was a figure previously stated by WFBC in a letter dated October 23, 2007, as a payoff amount. This letter actually describes the total recovery amount on October 27, 2007, as being $3.95 million; by 2008 this number would have increased. As has been noted, when challenged by WFBC, the guarantors were unable to provide proof of ability to tender the $1.3 million, and WFBC disregarded the claims.

fact as to the amount of damages and summary judgment as to this issue was properly granted. Thus, we affirm the judgment as to the amounts owed under the guaranties with the caveat that this figure could be reduced by a finding that the sale was not commercially reasonable.

V. *Counterclaims.* The guarantors raised a number of counterclaims which were denied at summary judgment.[15] They contend that these counterclaims arose under the going concern agreement. As we discussed previously, at pages 818-819, *supra*, the record does not support the guarantors' assertion that a cognizable "going concern" agreement was ever in existence. Under the terms of the guaranties, all counterclaims were waived.[16] Because there was no other cognizable agreement, "we agree with the judge's determination that under the terms of their guaranties, the [guarantors] waived their rights to assert these counterclaims." *Cambridgeport Sav. Bank* v. *Boersner*, 413 Mass. at 443.

*Conclusion.* So much of the judgment as implicitly determined that the sale of the collateral was commercially reasonable is reversed, and that issue is remanded to Superior Court for further proceedings consistent with this opinion. In all other respects, the judgment is affirmed.

*So ordered.*

---

[15]The guarantors' counterclaims included: breach of contract, unjust enrichment, unfair and deceptive trade practices, breach of implied covenant of good faith, fraudulent misrepresentation, bad faith, slander and defamation, breach of duty of care, fraud, negligence, and coercion and duress.

[16]Paragraph numbered eight in each of the guaranties provides in part that the guarantor "waives any and all defenses, claims, setoffs and discharges" of Environamics or any other obligor; "will not assert, plead or enforce against [WFBC] any defense of waiver, release, discharge or disallowance in bankruptcy, . . . fraud, . . . illegality or unenforceability" available to Environamics or any other obligor; and "will not assert, plead or enforce against [WFBC] any claim, defense, or setoff available to the [g]uarantor."