NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-1249

GORDON J. HARRIS & another[1]

vs.

IMAGING ADVANTAGE LLC.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

In 2008, plaintiff Massachusetts General Physicians Organization, Inc. (MGPO), agreed to license its intellectual property to Tele3D Advantage LLC (Tele3D Advantage), a subsidiary of the defendant, Imaging Advantage LLC (Imaging Advantage).[2] In exchange, Imaging Advantage and Tele3D Advantage agreed to pay MGPO royalties. This lawsuit concerns an exit royalty that Imaging Advantage and Tele3D Advantage agreed to pay "[w]ithin thirty days (30) following the first Liquidity Event," as that term was defined in an agreement into which the parties entered. Tele3D Advantage separately agreed to make a

_____

[1] Massachusetts General Physicians Organization, Inc.

[2] By the time of this lawsuit, Tele3D Advantage had dissolved, and this lawsuit does not involve any claims against Tele3D Advantage.

cash payment to plaintiff Gordon J. Harris, an employee of MGPO, "[u]pon a Liquidity Event."  Imaging Advantage was not a party to that agreement, but Harris claims that Imaging Advantage guaranteed Tele3D Advantage's obligations under the agreement and was Tele3D Advantage's alter ego and successor in interest. MGPO and Harris claim that three different liquidity events occurred and that any one of those events triggered Imaging Advantage's payment obligations.  A summary judgment entered in favor of MGPO and Harris on their claims for breach of contract and all parties appealed.  Concluding that there are genuine issues of material fact, we vacate the summary judgment and remand for further proceedings.[3]

Background.[4]  Effective November 19, 2008, MGPO, Imaging Advantage, and Tele3D Advantage entered into a licensing and servicing agreement (LSA) that set forth the following background.  "MGPO is a charitable corporation and an Affiliate of the General Hospital Corporation d/b/a Massachusetts General

---

[3] In a cross appeal, MGPO argues that it should have been awarded attorney's fees as the prevailing party under the terms of its agreement with Imaging Advantage and Tele3D Advantage.  Given our resolution of this case, where MGPO is not yet and may never be a prevailing party, it would be premature for us to address the issue of fees.

[4] "We recite the material facts in the light most favorable to the nonmoving party," Imaging Advantage.  Matter of the Estate of Urban, 102 Mass. App. Ct. 284, 285 (2023), quoting Docos v. John Moriarty & Assocs., 78 Mass. App. Ct. 638, 639 (2011).

2

Hospital."  "MGPO has developed intellectual property and expertise in three-dimensional ('3D') volumetric image reconstruction techniques and post-processing technologies (collectively '3D Techniques and Technologies') applicable to radiological images."  "Imaging Advantage has formed Tele3D Advantage to improve patient outcomes by increasing diagnostic knowledge through delivering excellent 3D volumetric image reconstruction and post-processing services that are universally available and cost effective for Clients in the United States and internationally (the 'Tele3D Advantage Purpose')."  "MGPO desires to license the 3D Techniques and Technologies to Tele3D Advantage and to commit to render to Tele3D Advantage services related thereto, and Tele3D Advantage wishes to obtain such license and the benefit of such services."

To that end, the parties agreed as follows.  MGPO agreed to "grant to Tele3D Advantage a non-assignable, perpetual, royalty-bearing license" to use intellectual property described as the "Licensed IP."[5]  Imaging Advantage and Tele3D Advantage agreed to pay three different types of royalties to MGPO.  This lawsuit concerns the exit royalty, which Imaging Advantage and Tele3D

---

[5] The license was to be used "solely for the Tele3D Advantage Purpose."  In addition, while the license was described as "non-assignable," the LSA stated that the license could "be assigned by Tele3D Advantage in connection with a sale of substantially all of its assets."

Advantage had to pay only "if all or a material component of the assets associated with the 3D Services (such assets are the '3D Assets') [were] disposed of in a Liquidity Event."[6]  The LSA defined "3D Services" to mean "the post-processing of any 2D radiological image or images by Tele3D Advantage, Imaging Advantage or any Affiliate(s) thereof . . . for the benefit of MGPO or any third party that produces or is intended to produce one or more 3D images."

Section 3.3.2 of the LSA described three different kinds of liquidity events:

"(i) an initial public offering ('IPO') of securities of Tele3D Advantage or an IPO of Imaging Advantage that includes the 3D Assets;

"(ii) a single transaction or a series of transactions pursuant to which any person . . . acquires the beneficial ownership, directly or indirectly, of greater than 50% of the combined voting power of the then-outstanding securities of any entity retaining the 3D Assets . . . entitled to vote generally in the election of directors (or limited liability company managers, if applicable) immediately after the consummation of the transaction or transactions, except that any acquisition of securities directly from Imaging Advantage or Tele3D Advantage shall be disregarded for purposes of this clause (ii); or

"(iii) the sale, lease, license or other transfer of ownership or material control rights relating to the 3D Assets, including any such transaction involving Imaging Advantage or Tele3D Advantage that includes the 3D Assets."

---

[6] The amount of the exit royalty was, at a minimum, five million dollars.

4

Also pertinent to this appeal is section 7.6, which set forth the provisions that would survive termination of the LSA. Section 7.6 stated, "The provisions of Sections 1, 2 (subject to Section 7.3), 3, 4.4.1, 5.1, 5.2 and 5.3 (to the extent of Royalties, Fees and Expenses accrued through such time), 6, 7, and 9 through 18 shall survive any termination or expiration of the Term of this Agreement."

As part of the overall 2008 transaction, Tele3D Advantage and Harris entered into a consulting agreement, effective November 19, 2008, in which Harris agreed to serve as a consultant to Tele3D Advantage and Tele3D Advantage agreed to compensate Harris as set forth in an attached schedule. Imaging Advantage was not a party to the consulting agreement but executed an attached guaranty stating that it "unconditionally and irrevocably guarantee[d] to [Harris] . . . the full and timely performance of all obligations of [Tele3D Advantage] under the foregoing Consulting Agreement." Under the guaranty, Imaging Advantage's obligations were to remain "in full force and effect without regard to any circumstance or condition whatsoever, including without limitation . . . any amendment, renewal, or other change in the Guaranteed Obligations or the Consulting Agreement."

By a letter agreement dated March 12, 2010, Tele3D Advantage notified Harris that it was terminating the consulting

agreement. The March 2010 letter agreement also confirmed that Tele3D Advantage and Harris were in the process of negotiating new terms.[7] A subsequent letter agreement, dated April 30, 2010, superseded and replaced the March 2010 letter agreement. The April 2010 letter agreement reiterated that the consulting agreement was terminated and that, with some exceptions not pertinent here, none of the provisions of the consulting agreement survived termination. Under the April 2010 letter agreement, Tele3D Advantage agreed to make a cash payment of $750,000 to Harris "[u]pon a Liquidity Event" as that term was defined in the LSA. Imaging Advantage did not execute a new guaranty in connection with the April 2010 letter agreement.

Four key events occurred thereafter. First, in December 2010, Goldman Sachs Group, Inc. (Goldman Sachs), bought newly-issued shares, specifically 8,818,366 "Class B Units," directly from Imaging Advantage, and Imaging Advantage redeemed other shares from existing shareholders. As a result, Goldman Sachs

---

[7] Harris asserts that the consulting agreement, effective November 19, 2008, was executed on the same day as the March 2010 letter agreement. Harris relies on Imaging Advantage's admissions, which are unclear. As pertinent here, Harris requested two admissions: (1) that "Imaging Advantage and Dr. Harris did not execute a consulting agreement until March 2010" and (2) that "Imaging Advantage and Dr. Harris executed the Consulting Agreement on or about March 12, 2010." Imaging Advantage denied the first statement but admitted the second. Regardless, nothing in our decision turns on the execution date of the consulting agreement.

acquired more than fifty percent of the outstanding shares of Imaging Advantage.  Second, in March 2011, MGPO exercised its right to terminate the LSA pursuant to section 7.4.3, which permitted MGPO to terminate the LSA if certain revenue milestones were not met.  Third, in July 2012, Imaging Advantage dissolved Tele3D Advantage.  Fourth, in April 2017, Envision Healthcare Corporation (Envision) acquired Imaging Advantage.

Discussion.  1.  Standard of review.  Summary judgment entered in favor of MGPO and Harris on the grounds that (1) the terms of the LSA unambiguously required Imaging Advantage to pay MGPO the exit royalty and (2) the terms of the April 2010 letter agreement and guaranty unambiguously required Imaging Advantage to make a $750,000 cash payment to Harris.  We review these questions of law de novo applying the following principles.  See Balles v. Babcock Power Inc., 476 Mass. 565, 571 (2017).  Where the terms of a contract are unambiguous, "its interpretation is a question of law that is appropriate for a judge to decide on summary judgment," but where the terms of a contract are "ambiguous, uncertain, or equivocal in meaning, the intent of the parties is a question of fact to be determined at trial." Seaco Ins. Co. v. Barbosa, 435 Mass. 772, 779 (2002).  See Matter of the Estate of Jablonski, 492 Mass. 687, 694 (2023). Ambiguity is assessed using the four corners of the document, "independent of extrinsic evidence concerning the drafting

7

history or the intention of the parties."  Bank v. Thermo Elemental Inc., 451 Mass. 638, 648 (2008).  "Contract language is ambiguous where the phraseology can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken" (quotation and citation omitted).  Id.

    2.  MGPO's claim for breach of the LSA.  a.  The Goldman Sachs transaction.  MGPO first seeks payment of the exit royalty on the basis that the Goldman Sachs transaction was a liquidity event under section 3.3.2(iii) of the LSA.  As noted, section 3.3.2(iii) provided that the following were liquidity events: "the sale, lease, license or other transfer of ownership or material control rights relating to the 3D Assets, including any such transaction involving Imaging Advantage or Tele3D Advantage that includes the 3D Assets."  MGPO reads the section as applying to any "change of control" where Imaging Advantage or Tele3D Advantage "cede[d] more than 50% ownership."[8]  Thus, MGPO asserts that the Goldman Sachs transaction was a liquidity event under section 3.3.2(iii) because Goldman Sachs acquired more than fifty percent of the outstanding shares of Imaging

-----

[8] On this and other points, MGPO argues that extrinsic evidence supports its interpretation of the LSA.  However, summary judgment entered on the basis that the terms of the LSA were unambiguous, and our review is therefore limited to the four corners of the document.  See Bank, 451 Mass. at 648.

8

Advantage.  Imaging Advantage has a different interpretation and reads section 3.3.2(iii) as applying only to asset sales. Imaging Advantage asserts that because the Goldman Sachs transaction was a stock sale where the ownership of the assets remained with Imaging Advantage, the Goldman Sachs transaction was not a liquidity event under section 3.3.2(iii).

Imaging Advantage's interpretation is not reasonable where it does not squarely address the language of section 3.3.2(iii). Imaging Advantage reads section 3.3.2(iii) as applying to transfers of ownership of the assets, i.e., asset sales, but those are not the words the parties used.  The parties instead contracted that transfers of ownership relating to the assets were liquidity events, as were transfers of material control rights relating to the assets.  This language is broad enough to include transactions other than asset sales.

While the language of section 3.3.2(iii) is broad enough to include transactions other than asset sales, the parties did not clarify what they intended to mean by a "transfer of ownership or material control rights relating to the 3D Assets, including any such transaction involving Imaging Advantage or Tele3D Advantage that includes the 3D Assets," and that language is susceptible to various reasonable interpretations.[9]  See Bank,

_____

[9] The LSA defined "control" only in the context of defining "Affiliates."  The LSA defined an entity's "Affiliates" to

9

451 Mass. at 648. MGPO's interpretation is reasonable, that the parties intended that section 3.3.2(iii) would include any transaction in which Imaging Advantage or Tele3D Advantage ceded more than half their ownership. However, other interpretations are also reasonable, including that Imaging Advantage or Tele3D Advantage needed to cede all their ownership or that another entity needed to gain control of Imaging Advantage's board of managers.

The characteristics of the Goldman Sachs transaction are consistent with some reasonable interpretations of 3.3.2(iii) but not others. MGPO relies on the fact that Goldman Sachs acquired more than fifty percent of the outstanding shares of Imaging Advantage. However, Imaging Advantage's board of managers retained "full, complete and exclusive authority, power and discretion to manage and control [Imaging Advantage's] business, property and affairs." A majority of managers present at a duly-constituted meeting ordinarily was required for the board to take action, and Goldman Sachs had the right to

---

include any corporation "controlled by or under common control" with that entity. In that context and for a for-profit entity like Goldman Sachs, the LSA defined "control" to mean "direct or indirect ownership of at least fifty percent (50%) of the voting securities having the right to elect directors." However, the LSA did not define "control" in any other context or clarify what the parties intended to mean by a "material" control right.

10

designate only two members to the seven-member board.[10]  While Goldman Sachs also effectively had veto power over certain actions,[11] including "[m]ak[ing] any material change in the nature of the business of [Imaging Advantage] from the Business,"[12] Goldman Sachs did not have that power over all actions.

In sum, the language of section 3.3.2(iii) is inherently ambiguous as applied to the Goldman Sachs transaction.  See, e.g., Jones v. Jones, 101 Mass. App. Ct. 673, 681 (2022) (words "any manner of bonus" were inherently ambiguous where there are many permutations of bonuses).  Thus, whether the parties intended that section 3.3.2(iii) would include a transaction such as the Goldman Sachs transaction "is a question of fact to be determined at trial."  Seaco Ins. Co., 435 Mass. at 779.[13]

_____

[10] Goldman Sachs's right to appoint two members was contingent on Goldman Sachs and its affiliates holding "at least 4,400,000 Class B Units (as adjusted for any unit distribution, split, combination or similar transaction)."

[11] For so long as Goldman Sachs and its affiliates held "at least 4,400,000 Class B Units (as adjusted for any unit distribution, split, combination or similar transaction)," Imaging Advantage could not take certain specified actions without the prior written consent of "a Class B Majority Interest."

[12] The "Business" of Imaging Advantage was "to directly or indirectly acquire, own, hold, manage, finance, sell and otherwise operate a radiology practice management business (including telemedicine, teleradiology and ancillary services)."

[13] Imaging Advantage also argues that reading section 3.3.2(iii) as applying to the Goldman Sachs transaction would circumvent

11

b.  Dissolution and acquisition.  MGPO alternatively seeks payment of the exit royalty on the basis that the dissolution of Tele3D Advantage and the acquisition of Imaging Advantage were liquidity events under section 3.3.2(iii) of the LSA.  However, the dissolution of Tele3D Advantage and the acquisition of Imaging Advantage both occurred after the termination of the LSA, and the extent to which the exit royalty survived the termination of the LSA is ambiguous.  Section 7.6 stated, "The provisions of Sections 1, 2 (subject to Section 7.3), 3, 4.4.1, 5.1, 5.2 and 5.3 (to the extent of Royalties, Fees and Expenses accrued through such time), 6, 7, and 9 through 18 shall survive any termination or expiration of the Term of this Agreement." If the second parenthetical is read as applying to section 3, then the obligation to pay the exit royalty survived the termination of the LSA only if the exit royalty already had

---

the plain language of section 3.3.2(ii).  Under section 3.3.2(ii), a transaction in which a person acquired the beneficial ownership of more than fifty percent of "the combined voting power of the then-outstanding securities of any entity retaining the 3D Assets" was a liquidity event, with the exception that "any acquisition of securities directly from Imaging Advantage or Tele3D Advantage [were to] be disregarded for purposes of this clause."  The parties agree that because Goldman Sachs bought its shares directly from Imaging Advantage, the Goldman Sachs transaction was not a liquidity event under section 3.3.2(ii).  Thus, Imaging Advantage argues that section 3.3.2(iii) should not be read as applying to a stock sale that did not qualify as liquidity event under section 3.3.2(ii).  At most, Imaging Advantage's argument raises another question regarding what the parties intended section 3.3.2(iii) to mean.

12

accrued. If the second parenthetical is not read as applying to section 3, then the obligation to pay the exit royalty survived the termination of the LSA in full. On this key point, section 7.6 is ambiguous.

The ambiguity arises from the sentence structure. The first parenthetical, "(subject to Section 7.3)," appears to apply only to the section immediately preceding the parenthetical, section 2, and not to section 1. That is because section 7.3 addresses the continuity of licenses, section 2 addresses licenses generally, and section 1 is unrelated to licenses. Using the same rule of construction, the second parenthetical, "(to the extent of Royalties, Fees and Expenses accrued through such time)," would apply at most to sections 5.2 and 5.3, which immediately precede the parenthetical and are not separated by a comma. However, where section 5.1 addresses royalties, section 5.2 addresses fees, and section 5.3 addresses expenses, reading the parenthetical as applying only to sections 5.2 and 5.3 would leave unexplained the reference to "Royalties" in the parenthetical. If the parenthetical applies to section 5.1, it arguably applies to section 3, which also addresses royalties.[14] Because the sentence structure of section 7.6

_____

[14] MGPO points to other sections of the LSA to support its argument that the obligation to pay the exit royalty survived the termination of the LSA in full. For example, MGPO contrasts section 7.4.1, which specifically stated that the exit royalty

creates an ambiguity, "the intent of the parties is a question of fact to be determined at trial."  Seaco Ins. Co., 435 Mass. at 779.[15]

Separately, the parties dispute whether Tele3D Advantage or Imaging Advantage had any "assets associated with the 3D Services" to dispose of when Tele3D Advantage was dissolved or Imaging Advantage was acquired, and thus whether either event could have been a liquidity event.[16]  The dispute turns on which assets were "the assets associated with the 3D Services."  Given our conclusion that there are genuine issues of material fact on the threshold question of the extent to which the exit royalty

---

would not survive a termination pursuant to that section, with section 7.4.3, which did not include similar language and was the section under which MGPO terminated the LSA.  MGPO argues that, reading the two sections together, the parties must have intended that the exit royalty would survive a section 7.4.3 termination.  We are not persuaded because, applying the ambiguous terms of section 7.6 to section 7.4.3, the parties also could have intended that the exit royalty would survive a section 7.4.3 termination only if the exit royalty already had accrued.

[15] Imaging Advantage's alternative argument, that termination of the LSA "extinguished" any consideration given in exchange for the exit royalty, is without merit.  There is no dispute that, for a time, Tele3D Advantage had the right to use MGPO's intellectual property.  The right to use MGPO's intellectual property served as consideration for the exit royalty, and this is not a case where MGPO did not provide any consideration at all.

[16] A liquidity event had to involve the disposition of "all or a material component of the assets associated with the 3D Services (such assets are the '3D Assets')."

14

survived the termination of the LSA, we need not reach the question.  However, where we remand, we provide the following additional guidance.  In part, MGPO relies on Imaging Advantage's admissions as establishing that Imaging Advantage had "assets associated with the 3D Services" following the termination of the LSA.  However, Imaging Advantage did not admit that fact.

MGPO requested an admission that "Tele3D Advantage and Imaging Advantage had assets associated with 3D Services after the termination of the [LSA]."  Imaging Advantage responded, "Denied.  Tele3D Advantage and Imaging Advantage had no assets associated with 3D Services as that term is defined in the [LSA]."  Then, MGPO requested admissions that (1) Imaging Advantage's contract with a competitor of MGPO, 3DR Laboratories, LLC (3DR Labs), was an "asset associated with 3D Services" and (2) "Imaging Advantage's contract with 3DR Labs was an asset associated with 3D services" (emphases added).  The only difference between the two requests was the emphasized capitalization.  Imaging Advantage denied the first statement but admitted the second.  Reading these answers together, it appears that Imaging Advantage was trying to distinguish "3D Services," as defined in the LSA, from "3D services," as used colloquially.  Thus, Imaging Advantage denied that the contract

15

with 3DR Labs "was an asset associated with 3D Services," as defined in the LSA.[17]

3. Harris's claim for breach of contract. Harris's claim for breach of contract against Imaging Advantage presents the added complexity that he seeks payment under the terms of the April 2010 letter agreement, to which Imaging Advantage was not a party. To the extent Harris relies on Imaging Advantage's guaranty, executed in connection with the prior 2008 consulting agreement, the claim fails as a matter of law. The guaranty plainly stated that Imaging Advantage was guaranteeing Tele3D Advantage's obligations under "the foregoing Consulting Agreement," not future obligations such as those arising under the April 2010 letter agreement. See Wells Fargo Business Credit v. Environamics Corp., 77 Mass. App. Ct. 812, 816 (2010)

---

[17] To the extent MGPO relies on a separate admission that "[t]he services provided by 3DR Labs pursuant to its agreement with Imaging Advantage included post-processing of 2D radiological image or images that produces or is intended to produce one or more 3D image for the benefit of a third party," we are unpersuaded for similar reasons. MGPO suggests that this was an admission that 3DR Labs was providing "3D Services" and that MGPO had "assets associated with the 3D Services." However, that is not necessarily true because the LSA defined "3D Services" to mean "the post-processing of any 2D radiological image or images by Tele3D Advantage, Imaging Advantage or any Affiliate(s) thereof . . . for the benefit of MGPO or any third party that produces or is intended to produce one or more 3D images" (emphasis added). As Imaging Advantage explained, it was not admitting that 3DR Labs was an affiliate of Imaging Advantage or Tele3D Advantage.

16

("guaranty is to be construed strictly" [citation omitted]). While the guaranty also stated that Imaging Advantage's obligations remained in full force and effect despite any amendments to, or termination, cancellation, or discharge of the consulting agreement, this language did not expand the scope of the guaranty but only affected its duration. Imaging Advantage's guaranty of Tele3D Advantage's obligations under the 2008 consulting agreement did not extend to obligations arising under the later April 2010 letter agreement that superseded it.[18]

However, this does not mean that summary judgment should have entered in favor of Imaging Advantage on Harris's claim for breach of contract. Harris also alleged that Imaging Advantage was Tele3D Advantage's alter ego or successor in interest. Because Harris did not seek summary judgment on those theories

---

[18] Harris relies on extrinsic evidence to support its interpretation that the April 2010 letter agreement amended the consulting agreement and that neither the March 2010 letter agreement nor the April 2010 letter agreement terminated the consulting agreement. In part, Harris points to evidence that the consulting agreement was not executed until the same day as the March 2010 letter agreement, see note 7, supra, and argues that the guaranty would have been a nullity if the consulting agreement was executed and terminated contemporaneously. However, "extrinsic evidence cannot be used to contradict or change the written terms." General Convention of the New Jerusalem in the U.S. of Am., Inc. v. MacKenzie, 449 Mass. 832, 836 (2007). The April 2010 letter agreement unambiguously stated that it "supersede[d] and replace[d]" the March 2010 letter agreement, and that the 2008 consulting agreement was "terminated without [c]ause, effective immediately."

and the motion judge did not address either theory, whether Harris may recover for breach of contract against Imaging Advantage as Tele3D Advantage's alter ego or successor in interest is not before us.  Harris may pursue the theories on remand.

Conclusion.  The judgment is vacated, and the matter is remanded for further proceedings consistent with this memorandum and order.[19]

So ordered.

By the Court (Wolohojian, Desmond & Sacks, JJ.[20]),

Assistant Clerk

Entered:  January 17, 2024.

---

[19] After the motion judge ruled in favor of MGPO and Harris on their motion for summary judgment, they submitted a motion to secure the judgment.  That motion was allowed, in part, such that Imaging Advantage was ordered to post an appeal bond.  The appeal bond shall remain in effect on remand and during the pendency of any subsequent appeals, unless and until a judge of the Superior Court orders otherwise.

[20] The panelists are listed in order of seniority.

18